

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-73,484-02

### EX PARTE NEAL HAMPTON ROBBINS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 98-06-00750-CR(2) IN THE 410TH DISTRICT COURT MONTGOMERY COUNTY

**JOHNSON, J., filed a concurring opinion.**

### C O N C U R R I N G   O P I N I O N

The various positions on statutory interpretation seem to agree that the legislative history indicates that the intent of this statute is to provide relief to those who were convicted on science or scientific methodology that is now known to be unsound.

My first observation is that "scientific method" and "scientific methodology" are not the same. "Scientific method" is the observation of some phenomenon in the world, the formulation of a theory–a possible explanation of that phenomenon–and testing of that possible explanation to see if the phenomenon is indeed explained by that theory. For example, in the 18th century, inoculation against smallpox used the live smallpox virus itself, producing a high risk of contracting the disease

and dying. Dr. Edward Jenner, among others, observed that milk maids who had suffered through cowpox, a relatively mild disease, did not contract small pox. His theory was that having had cowpox protected one against smallpox. He tested his theory by inoculating 24 subjects with pus from the cowpox blisters on a local milkmaid and then exposing those persons to smallpox. None of his subjects developed smallpox, thus verifying his theory. A quirk of the scientific method is that, even after the theory has been thoroughly tested and proven to be an accurate explanation of the observed phenomenon, it is still referred to as a theory, as in "the theory of gravity," even though the "theory" has become universally accepted as fact.

"Scientific methodology," on the other hand, is the means by which a theory is tested. In Jenner's cases, the methodology was to scrape pus from a human who had active cowpox and using that pus to inoculate other humans, then exposing them to smallpox to confirm that the inoculation with cowpox provided immunity to smallpox. If the theory being tested is that blood is thicker than water, the methodology is likely to involve measuring the viscosity of blood and water and comparing the results. Automobile manufacturers constantly test new theories about injury prevention and mitigation with crash-test dummies.

The words of Article 11.073 state that it "applies to relevant scientific evidence . . . that was not available to be offered . . . at the convicted person's trial; or . . . contradicts scientific evidence relied on by the state at trial." Relief may be granted if "relevant scientific evidence is currently available and was not available at the time of . . . trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial."

"Evidence" is what is presented at trial in support of the litigants' positions. "Scientific

evidence" is presented by scientists, and the content of that evidence depends on the knowledge of that particular witness about the science at issue. "Bad science" and "bad scientists" are inseparable. A scientist may not intend to present bad science, nor must that scientist be a bad scientist in every situation. Linus Pauling won a Nobel Prize in chemistry and would certainly be a good scientific witness if he testified about his work in chemistry. However, he would be a bad scientist presenting bad science if he were called as a witness to the unlimited powers of vitamin C.

Because evidence is what is presented at trial by a witness and is therefore limited by the personal knowledge of that witness, logically the statute must be intended to address the personal knowledge of scientific witnesses. Personal knowledge increases over time as one gains new knowledge and refines one's understanding of one's older knowledge. New law graduates may know book law, but most have not yet learned how to integrate book law with trial tactics. And some skills simply cannot be learned anywhere except in the crucible of practice in the real world. New lawyers are likely to lose trials that a more experienced lawyer would not, merely because they have not yet developed the interpretive skills of that more experienced lawyer. Or they might choose to try a case that a more experienced lawyer, after careful consideration of the facts, would choose to settle.

The same is true of physicians. Because of inexperience, a resident may miss a diagnosis that a more experienced doctor would have made, merely because the older doctor had seen the grouping of apparently unrelated symptoms before or was knowledgeable about uncommon diseases or just knew more about what questions to ask the patient. Some practitioners, of law or medicine, may not keep up with the current literature. The result of inexperience or out-dated knowledge may be testimony that may rightfully be called bad science, even if not intentionally so, and that testimony

may persuade a jury to convict when it should not.

This is just such a case. Testimony indicated that the child's injuries could have been inflicted intentionally, but it also indicated that the injuries could have resulted from improper CPR;[1] how much of the general public knows that CPR on infants is done with two fingers and at 100 beats per minute?[2] Only Dr. Moore testified at trial that the cause of death was homicide. Experienced pathologists testified that the cause of death could not be determined. At the time of the original trial, Dr. Moore had only 18 months of experience as an associate medical examiner and had been cited for defective and improper work. With eight more years of experience, she testified that she

---

[1] Q. Now, I'll give you another situation. An E.M.T. comes up to the location where the adults are trying to do CPR and they are putting a lot of pressure on that kid and blowing a lot harder than they should, and she says, "If she's not already dead, you're going to kill her; stop that," and proceeded to show them the proper way. Would you say that some of that could have led to injuries to the child, adults putting their full weight down and trying to revive that child?
  A. You should see it more anteriorly than posteriorly.
  Q. Pardon?
  A. You should see it more the front to the back, the injuries.
  Q. If you've got your palms on the front and you've got little rocks and sticks on the back, you'll see it on the back, you'll see it on the back, won't you?
  A. Yes. You'd see bruises on the back.
  Q. But you wouldn't necessarily see them on the front if they're pushing with their palms, would you?
  A. No.
  Q. And they could be misfiring and hitting down in the area of the eleventh and twelfth ribs and cause that sort of damage without any noticeable trauma from looking at the skin, couldn't they?
  A. If they're pushing down lower, yes.

*Robbins v. State*, 88 S.W.3d 256, 258 (Tex. Crim. App. 2002).

[2] "Give 30 gentle chest compressions at the rate of at least 100 per minute. Use two or three fingers in the center of the chest just below the nipples. Press down approximately one-third the depth of the chest (about 1 and a half inches)." http://depts.washington.edu/learncpr/index.html (University of Washington)

"Place 2 fingers on the breastbone–just below the nipples. Make sure not to press at the very end of the breastbone. Keep your other hand on the infant's forehead, keeping the head tilted back. Press down on the infant's chest so that it compresses about 1/3 to 1/2 the depth of the chest. Give 30 chest compressions. Each time, let the chest rise completely. These compressions should be FAST and hard with no pausing. Count the 30 compressions quickly: '1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30, off.'" http://www.nlm.nih.gov/medlineplus/ency/article/000011.htm (National Institutes of Health)

believed that the cause of the child's death could not be determined. That "relevant scientific evidence . . . was not available at the time of the convicted person's trial," and it "was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; . . .." The only person who now clings to a firm opinion of homicide is Dr. Norton, who closed her practice, moved from her home, and declined to be deposed for a habeas hearing.

As has been noted, some examples of "contradicted scientific evidence relied on by the state at trial" include arson, infant trauma, bullet-lead analysis, bite marks, some ballistics tests, blood-spatter patterns, and scent line-ups. Some such evidence has involved misinterpretation based on out-dated knowledge, some are simply junk science that has never been subjected to any kind of scientific investigation. Whether "debunked" or "refined" for increased accuracy, changes in scientific knowledge in general, and therefore changes in scientific testimony by individuals, must be acknowledged and addressed. As Judge Cochran noted in her dissent in applicant's original application for habeas corpus,

> When scientific experts honestly and sincerely thought "X" was true at the time they testified, but the science has changed or the experts' understanding of the science has changed and their opinions have changed, what cognizance of that change should the criminal justice system take long after a person has been convicted?

*Ex parte Robbins*, 360 S.W.3d 446, 469 (Tex. Crim. App. 2011)(Cochran, J., dissenting).

The legislature has made it clear that advances in DNA technology may be the basis for re-examining convictions. Advances and changes in other forms of scientific knowledge, and thus in scientific testimony from individuals, should also be available as bases for re-examination of convictions.

I join the opinion of the Court.

Filed:  November 26, 2014
Publish