

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00072-CR

DONALD WAYNE READ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1793841

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

After he was convicted by a Tarrant County[1] jury for the felony offense of driving while intoxicated (DWI),[2] Donald Wayne Read filed a motion for new trial, alleging that a police officer presented false testimony and that, as a result, Read was deprived of due process. On appeal, Read presents two intertwined arguments: (1) that the motion for new trial should have been granted because "evidence conclusively established that the State violated [Read]'s due process rights by presenting to the jury false, material evidence" and (2) that "the State violated [Read]'s due process rights by failing to provide [Read,] before trial[,] [with] impeachment evidence." While we find a violation of Article 39.14 of the Texas Code of Criminal Procedure, we find that the error was harmless. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14 (Supp.). As a result, we find no abuse of discretion in the trial court's denial of the motion for new trial. We modify the court's judgment to correctly reflect the findings on the State's enhancement allegations. As modified, we affirm the trial court's judgment.[3]

## I. Background

At the heart of Read's motion for new trial and this appeal are statements made by Sergeant Thomas Gilbert with the Azle Police Department (APD), the first officer to encounter Read on the night in August 2023 that led to his arrest and conviction for felony DWI. After conducting a traffic stop on Read, Gilbert suspected Read was intoxicated and called another

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We follow the precedent of the Second Court of Appeals in deciding the issues presented. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 49.09(b) (Supp.). Read's punishment range was enhanced by two prior DWI third or more convictions, and he was sentenced to sixty years' imprisonment.

2

officer to investigate. Gilbert made comments to fellow APD Officer Marco Gallardo that he believed Read was at an establishment that served alcoholic drinks for more than an hour before Gilbert conducted a traffic stop on Read. After the trial, Read acquired documents that seemed to contradict Gilbert's statements and showed that only twenty-two minutes elapsed between his first observation of Read and his second observation, when Gilbert conducted the traffic stop. Read claims that Gilbert presented false testimony and that the State should have produced Texas Department of Public Safety (DPS) records, which could have been used to impeach Gilbert's testimony. A chronology of events sets the scene for our analysis.

### A.    Trial Evidence[4]

Late on the evening of August 25, 2023, Gilbert was on patrol when he saw a trailer parked inappropriately. Around the same time, he also saw Read's dark-colored, Chevrolet pickup truck with an insufficiently illuminated license plate. *See* TEX. TRANSP. CODE ANN. § 547.322(f). Gilbert followed the truck and saw it turn into the parking lot of a pool hall called Opentable, which sold alcoholic beverages. Gilbert testified that, around midnight, he ran a check of the truck's license plate using his vehicle's mobile computer and discovered the truck's registration had expired in November 2021.

Gilbert continued to investigate the trailer. Later, he saw the same truck leaving the parking lot of Opentable and followed it. He confirmed it was the same truck with an expired registration by calling the license plate number in to dispatch.[5] Gilbert conducted a traffic stop

---

[4]Read stipulated to two jurisdictional prior DWI convictions.

[5]On the recording of his body-camera footage introduced into evidence, Gilbert can be heard reading the license plate number to the dispatcher. The dispatcher confirmed that the vehicle registration expired in November 2021.

3

and found that the truck was driven by Read. Gilbert described Read as having "slowed and slurred" speech, stated that "his eyes were glassy and watery," and testified that he "detected a reasonable amount of alcoholic beverage emanating from inside the vehicle." Read told Gilbert that he was coming from home and denied having had any alcoholic drinks. When Gilbert told Read that he had just seen him leave the Opentable establishment, Read explained that he had stopped to ask for directions to the local hospital.

Gilbert called for back-up about 1:20 a.m., and Gallardo arrived and took over as the primary officer. Gallardo testified that, when he received the call from Gilbert, he could hear Read in the background, and his speech was "slurred." The State played Gallardo's body-camera footage for the jury. Gilbert's summary of why he stopped Read was one of the first things on the recording, including his statement that he had first noticed Read about an hour earlier. Then he summarized his observations of Read, which suggested intoxication.

Read refused to attempt the field-sobriety tests that Gallardo requested, explaining he had a painful hernia. Gallardo tried to initiate a horizontal gaze nystagmus test, but Read refused to "look at [the] blue light." Gallardo told Read that, if he refused to cooperate and perform the field-sobriety tests, he risked being arrested for DWI.

Gilbert then inserted himself into the conversation. He told Read that he knew Read had been at Opentable for more than five minutes and that he had noticed Read's truck an hour before Gallardo arrived on scene. Gilbert also told Read that he knew Read had been at Opentable "an hour or so." Although Read complains that Gilbert presented false testimony,

_____

From the record, this was the second time Gilbert checked the status of Read's vehicle registration. The first time he checked, he did so by submitting the license plate information via his in-car computer.

Gilbert's remarks captured on Gallardo's body-camera recording are the only places where the statements about which Read complains were made in front of the jury. Because Read would not supply a breath sample, Gallardo got a blood search warrant and took him to a hospital.

The recording from Gallardo's body camera also shows Read's behavior at the hospital. Read argued with the nurse, complaining about not receiving pain medication. His speech was slurred, and the nurse told him he could not receive pain medication because he was intoxicated. Read also argued with the nurse that he was not intoxicated, finally dismissing her with, "F**k y'all."[6]

The blood draw occurred at 4:05 a.m., almost three hours after Read was arrested. Read's blood alcohol concentration (BAC) at the time of the draw was 0.084, with an uncertainty rate of 0.008. Dr. Robert Johnson, the chief toxicologist at the Tarrant County Medical Examiner's Office, supervised the chemists who analyzed Read's blood and reviewed their work. He testified that, when blood is drawn three hours after a traffic stop with a result of 0.084, a person's BAC would have initially been between 0.11 and 0.57 at the time of the traffic stop. Read's blood also showed a level of THC, but it was so low that Johnson said Read had probably used THC the day before the blood draw.

On cross-examination, Johnson agreed that, with the "uncertainty amount" of "plus or minus .008," it was possible that Read's "BAC was less than a .08" when the sample was taken (i.e., about three hours after the traffic stop).

---

[6]The body-camera footage at the hospital is about eighteen minutes long, and Read was generally argumentative and quarrelsome with the police officers in the room. At one point, he demanded his reading glasses and told the officers that, if he could not read the blood search warrant that they presented to him, the warrant was not valid. The nurse was able to procure a set of reading glasses, and Read then read the search warrant aloud and complained about its legalese and incomprehensibility.

Read presented testimony from Dwain Fuller, a retired forensic toxicologist, who "generally agree[d]" with Dr. Johnson's testimony. As to the uncertainty rate of 0.008, Fuller testified there was a "statistical possibility" that Read's BAC was less than 0.08 at the time Gilbert conducted the traffic stop.[7] As for Read's denial of alcohol consumption to Gilbert and Gallardo, Fuller stated, "[T]hat obviously wasn't true."

Read's employer, Christian Giroux, an engineer in the natural gas industry, testified that Read reviewed legal documents for the company. Read's attorney played Gallardo's body-camera footage at the hospital for Giroux. According to Giroux, the speech exhibited by Read in the recording was his usual speaking pattern. He testified that Read "has a heavy southern accent" and is "sometimes almost unintelligible." He further stated that Read "normally wasn't quite so cantankerous" as he was in the hospital recording, and Giroux knew that Read experienced incidents of extreme pain from his hernia. Giroux had seen documents substantiating Read's health, and he knew Read was seeking surgical assistance. As for Read's gait, Giroux testified, "I would say he was not an able mover. He's a somewhat elderly man and was certainly not spry. And I believe that when the pain was affecting him, he was even less mobile than normal." Giroux testified that the way Read looked, talked, and walked as seen in the recording was consistent with his usual behavior.

_____

[7]Within nine lines of testimony in the reporter's record, Fuller made the following two statements:

> [W]hat that uncertainty measurement means, which I believe was plus or minus .008 -- it just means that there's a statistical probability that the number lies -- the true number lies between those two numbers, but encompassed in that ranges is several values below an 08 as well and above an 08.

Then, when asked by Read if it was "fair to say that . . . Read may even have had a blood alcohol concentration of under a .08 at the time he was tested three hours after the stop," Fuller answered, "Yes. That's a statistical possibility, yes."

**B.      Post Trial**

After the trial, Read acquired some documents from DPS/TLETS[8] that indicated Gilbert had first run Read's license plate at about 12:59 a.m. and then at about 1:21 a.m. Based on Gilbert's statements on Gallardo's body-camera footage, which were played at trial, Read complained in his motion for new trial that Gilbert had presented false testimony to the jury. Read further complained that, since the documents were obtained from TLETS, they were available to the State as evidence for impeachment of Gilbert and, therefore, should have been provided to Read before his trial. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14 (Supp.); *Watkins v. State*, 619 S.W.3d 265, 291 (Tex. Crim. App. 2021).

**1.      Read's Motion for New Trial**

In his motion for new trial, Read claimed that, before trial, his counsel emailed the prosecutor, Kimberly Barragon, and requested that the State provide counsel "with the call sheet, dispatch log, or other paper or electronic documentation showing how Sgt. Gilbert determined that Mr. Read's vehicle's registration was expired." Barragon told Read's counsel that she had "checked with the detective who said they did not have any such documentation." That email was not included in Read's motion and is not in the appellate record; further, Read's motion was not sworn. Read further claimed in his motion that "[t]he TLETS records reflect the earliest action related to Defendant was at 01:25:36 hours on August 25, 2023." Read claims in his motion that "[f]alse testimony from Sergeant Gilbert and the State's failure to disclose

---

[8]The Texas Law Enforcement Telecommunications System (TLETS) is a record-keeping system overseen by the DPS.

7

impeachment evidence (TLETS records), violated [Read]'s constitutional and statutory rights." Read attached no documents to his motion.

### 2. The State's Response

The State responded to Read's motion and attached an affidavit from the State's trial prosecutor, Barragon (exhibit A), 200 pages of records the State obtained from DPS/TLETS for the license plate number AJ17620 (Read's truck) (exhibit B), and eleven pages of DPS/TLETS acquired by Read's attorney that formed the basis of the allegations in his motion (exhibit C). "After reviewing [the records in exhibit C], [Barragon] determined that [defense counsel] had provided DPS with the incorrect license plate number (AJ7620) for Mr. Read's vehicle." The State argued that, because Read based his argument for a new trial "solely on records obtained by a subpoena with a flawed search parameter, i.e., a typographical error in the defendant's license plate number," the records obtained by Read, post-trial, were immaterial. The documents acquired and presented by the State include several entries seeming to show some action or inquiry by law enforcement at about 12:59 a.m., August 25, 2023, and then at 1:21 a.m. the same date. Exhibit C to the response, which the State claimed were the documents provided by Read, includes information suggesting they were records for license plate number AJ7620, whereas Read's truck license plate number was AJ17620.

### 3. The Motion for New Trial Hearing

At the hearing on the motion for new trial, both parties operated under the assumption that about twenty-two minutes elapsed between the first time Gilbert checked the license plate number and when he re-checked it immediately prior to conducting his traffic stop of Read.

8

Read elicited testimony from Gilbert that, had he had the information available "in front of [him] . . . [then], the [trial] testimony would have been different" and that his trial testimony was "false," though not deliberately so. On cross-examination by the State, Gilbert testified that "'inaccurate' would be a more appropriate term than 'false'" and that he made a "mistake" about his estimation of time.

Barragon testified that, before trial, Read's trial attorney, Catherine Dunnavant, asked Barragon to subpoena records from DPS/TLETS relevant to the time(s) of Gilbert's inquiries into Read's license plate number and that Dunnavant told Barragon she "had previously subpoenaed said records on unassociated cases." Barragon said that, in a phone conversation with Dunnavant, Dunnavant asked about "metadata."

> [Dunnavant] kept going in circles over the phone about being -- you know, thinking that if [Gilbert] ran it through the license plate and that's how he discovered the registration was expired that there should be metadata showing that.

Barragon did not understand the term "metadata" and told Dunnavant that she would inquire with the case's detective "if they had any documentation showing if [Gilbert] ran the license plate." In response, "that detective sent [Barragon] to someone in records."

Barragon further testified that "the records department . . . also didn't really understand 'metadata,'" then subsequently told her "that [Gilbert] ran it through dispatch -- and you can see that on the body-worn camera -- and that if Sergeant Gilbert had ran it through his computer,[9]

---

[9]Gilbert testified that he entered the license plate number in his "mobile data terminal," which is essentially a computer in his police car.

then DPS keeps those records, not them." Barragon relayed that information to Dunnavant on March 13, 2024, five days before trial.

> Dunnavant told Barragon that

> she wasn't going to subpoena those records because she didn't want to trigger a continuance, and she thought that this defendant wanted a trial and it should be tried. And she also said that she thought it would be faster if I issued -- or faster and easier if I issued the subpoena for her.

Barragon told Dunnavant she would not subpoena the records at issue. Also, in questioning Gilbert before the jury, Dunnavant said, "[I]n these cases, I often get evidence and I often see the TLETS data."

Barragon then described events chronicled in her affidavit attached to the State's response to Read's motion for new trial, including her receipt, post-trial, of TLETS documents from Read's attorney and the incorrect license plate number upon which those documents were acquired. Barragon or someone in her office spoke to Gilbert on March 18, the day of the suppression hearing, and determined that he "ran the license plate through his computer."

It should be noted that, in about 200 or more pages of TLETS documents in our record, each one has the following header:

> This report reflects events recorded in TxDPS system(s) as applied to your request. Due to the complexity of the TxDPS offline search processes, **it is possible that this report may not reflect every transaction which may have occurred**. Recipients of the information contained in this report must abide by dissemination and disposal policies established and published by FBI CJIS in the CJIS Security Policy and NCIC Operating Manual.

(Emphasis added).

10

At the hearing on the motion for new trial, no explanation was given for the hundreds of pages of DPS/TLETS documents or how to read the information in those documents, although there are some explanations of some abbreviations. If we understand the State's argument and exhibits, one of the TLETS documents contains the "Date: 20230825: 005921," which indicates that a request for information was made at 12:59:21 the morning of August 25, 2023, for vehicle license plate AJ17620. Another page from the submitted documents seems to indicate another license plate number check was requested at 1:21 a.m. The trial court heard arguments from the parties and denied the motion for new trial.

## II.     *Watkins* and Article 39.14

Although this case is presented as an appeal of the trial court's denial of Read's motion for new trial, that motion argued a violation of Article 39.14. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14 (Supp.). We must review that allegation under the analysis required by *Watkins* in order to conduct our review of the trial court's ruling on the motion for new trial. "Article 39.14(h) places upon the State a free-standing duty to disclose all 'exculpatory, impeaching, and mitigating' evidence to the defense that tends to negate guilt or reduce punishment." *Watkins*, 619 S.W.3d at 277 (quoting TEX. CODE CRIM. PROC. ANN. art. 39.14(h)). "Any evidence that does not fall under Article 39.14(h)—that is, any evidence that does not tend to negate guilt or mitigate punishment—must be disclosed upon request without any showing of 'good cause' or the need to secure a discretionary trial court order." *Id.* The State's burden of production extends to "evidence material to any matter involved in the action and that [is] in the possession,

custody, or control of the state or any person under contract with the state." TEX. CODE CRIM. PROC. ANN. art. 39.14(a).

The *Watkins* court read Article 39.14(a)'s language, "material to any matter involved in the action," *id.*, to "cover[] any number of subsidiary issues impacting the outcome of the proceedings," *Watkins*, 619 S.W.3d at 278. In the context of Article 39.14, "evidence need only have a logical connection to a fact of consequence to any number of subsidiary issues rather than to the outcome itself." *Id.* at 280.

The TLETS data, suggesting that Gilbert's checks on the status of Read's vehicle registration were done about twenty-two minutes apart, could have been used to impeach Gilbert's statements recorded on Gallardo's body camera, where Gilbert said he first saw Read's vehicle an hour before conducting his traffic stop and then confronted Read with those accusations. Read filed a written discovery request on November 30, 2023, about three and one-half months before trial.[10] Trial counsel for both sides had a conversation the week before trial where that topic was discussed. "Article 39.14 can be violated by a prosecutor's non-disclosure of evidence due to law enforcement's failure to turn evidence over to the prosecution, even if law enforcement's possession of evidence is unknown to counsel for the State." *State v. Heath*, 696

---

[10]"With the exception of privileged evidence and evidence specifically covered by other statutory provisions, the only obstacle to disclosure of evidence not already covered by Article 39.14(h) is the lack of a specific request." *Watkins*, 619 S.W.3d at 278.

S.W.3d 677, 693 (Tex. Crim. App. 2024).  The State should have produced the requested TLETS

documents.  *See Watkins*, 619 S.W.3d at 291.[11]  We now review for harm.

### A.      The Article 39.14 Violation Was Harmless

A violation of Article 39.14 is statutory error, reviewed for non-constitutional error.  *See*

*Hance v. State*, No. 02-19-00237-CR, 2025 WL 648349, at *45–46 (Tex. App.—Fort Worth

Feb. 27, 2025, no pet.).  "Any other error, defect, irregularity, or variance that does not affect

substantial rights must be disregarded."  TEX. R. APP. P. 44.2(b).  "[A]n error does not affect a

substantial right if the appellate court has a fair assurance from an examination of the entire

record that the error did not influence the jury or that it had but a slight effect."  *Hance*, 2025 WL

648349, at *46 (citing *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021)).

> In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error.  We may also consider the jury instructions; the State's theory and any defensive theories; closing arguments; and even voir dire, if applicable.

*Id.* (citations omitted).[12]

---

[11]"[O]nce discovery of an item is requested, the State now has an affirmative duty to search for the item and produce it to the defendant in a timely manner."  *State v. Heath*, 642 S.W.3d 591, 597 (Tex. App.—Waco 2022), *aff'd*, 696 S.W.3d 677.

[12]We do not agree with Read that this was an error of constitutional dimension.  He argues that Gilbert presented false testimony, which would elevate the error to one of due process.  *See Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015) (orig. proceeding).  In *Ex parte De La Cruz*, a murder witness testified that Cruz shot the victim once in the face, then made the witness help move the body to a nature center.  *Id.* at 859.  At trial, the medical examiner testified that it was more likely the victim was killed where he was found.  *Id.* at 860.  Post trial, another medical examiner opined that the victim was shot twice—that what had originally been deemed an exit wound was in fact a second gunshot wound—and agreed that the victim had likely been shot where he was found. *Id.* at 861–62.  On habeas review, Cruz argued that this proved the witness's "testimony was false in its entirety." *Id.* at 861.  The Texas Court of Criminal Appeals held that the conflicts in the evidence were not sufficient to prove the murder witness presented false testimony.  *Id.* at 869–70.

13

### 1.     Character of the Error

We find that Read's inability to impeach Gilbert's credibility had little to no impact on the jury's finding of guilt.  Gilbert already had probable cause to stop Read's vehicle due to the insufficiently lit license plate.  Checking the status of the vehicle's registration was just part of the officer's investigation.  On Gilbert's body-camera recording, the flashing lights on his patrol car instructing a vehicle to pull over were already flashing as he called dispatch to check the license plate.  He was initiating a traffic stop while verifying the status of the license plate.  If dispatch had told Gilbert that Read's vehicle had a current registration, it is reasonable to think Gilbert would have proceeded with the traffic stop based on the faulty license plate illumination.

At the scene, Gilbert yielded the investigation to Gallardo, who determined that Read had committed the offense of DWI and arrested him.  The non-disclosed evidence had no bearing on the facts of consequence in the case (i.e., was Read intoxicated while operating a motor vehicle in a public place).  Rather, it regarded a collateral matter:  impeachment of Gilbert's estimation of time leading up to his traffic stop.[13]

---

Similarly, in *Ex parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011) (orig. proceeding), the medical examiner testified at trial that the victim died of "asphyxia[tion] due to compression of the chest and abdomen and that the manner of death was homicide." *Id.* at 450.  Post trial, another medical examiner reviewed the trial evidence and concluded that "the autopsy did not support a finding that the death resulted from asphyxiation by compression or from any other specific cause." *Id.* at 453.  The post-trial medical examiner amended the autopsy report to state, "[T]he cause and manner of death was 'undetermined.'" *Id.*  The trial medical examiner revisited her initial autopsy report and, based on her experience since the original autopsy, agreed that the cause of death was undetermined. *Id.* at 454.  Contrary to Robbins's habeas argument, the original medical examiner had not falsely testified. *Id.* at 461.

Here, Gilbert's acknowledgement, after trial, that he was mistaken about his estimation of how long Read was at the pool hall, similarly, does not amount to false testimony but was closer to a "re-evaluation" based on the data gathered after trial. *See id.* at 459.  Thus, it is not a due-process violation, as Read claims. *See id.* at 463. (Because the medical examiner's testimony was not "proven false," "the State did not use false evidence to obtain [Cruz]'s conviction, and [Cruz] d[id] not have a due process right to have a jury hear [the medical examiner]'s re-evaluation.").  Therefore, the error in not disclosing the information will be reviewed for non-constitutional error.

[13]In addition to the improperly parked trailer, Gilbert testified at the hearing on the motion for new trial that he was the supervising officer for the overnight shift that night.  In between his checks of Read's license plate, and, along

The character of the error weighs against a finding of harm.

### 2. Nature of the Evidence Supporting the Verdict/Other Evidence Supporting Guilt

There was substantial evidence supporting the jury's verdict, which we have discussed above. The jury could reasonably have found Read guilty of DWI, third or more. Given the strength of the inculpatory evidence, these factors weigh against a finding of harm.

### 3. State's Emphasis of the Complained-Of Error

The State, in its opening argument, outlined the expected evidence and told the jury that Gilbert saw Read's truck pull into the Opentable parking lot and then, "[a]bout an hour later," saw it again. In closing, the State highlighted Gilbert's statement, "I saw you in there for at least an hour because I saw you earlier" to point out Read's inconsistent and deceptive statements to law enforcement at the traffic stop. The State did not mention Gilbert's statements in its closing rebuttal. This weighs slightly in favor of finding harm.

Reviewing the entire record, we find the non-disclosure of impeachment evidence did not affect Read's substantial rights. Gilbert essentially made a misjudgment of elapsed time before he performed a traffic stop of Read, but he still had a valid and legal basis for that stop. Beyond that, his error in assessing how much time had elapsed between his sightings of Read's vehicle had nothing to do with whether the State proved Read committed the offense of DWI.

Finding the Article 39.14 violation was harmless error, we now address the trial court's ruling on Read's motion for new trial.

---

with other officers, he investigated an "aggravated assault with a deadly weapon" during his shift. As part of that investigation, they "collect[ed] several witness statements." There were "several priority calls" on his shift, and he did not write his report on the Read incident until "towards the end of [his] shift," "three to four hours, probably," after stopping Read.

### III.	Motion for New Trial

#### A.	Standard of Review

"We review a trial court's ruling on a motion for new trial for an abuse of discretion." *Ford v. State*, 444 S.W.3d 171, 182 (Tex. App.—San Antonio 2014), *aff'd*, 477 S.W.3d 321 (Tex. Crim. App. 2015). "We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). "An appellate court" will "revers[e] only if no reasonable view of the record could support the trial court's ruling." *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). "The trial court's ruling is within the 'zone of reasonable disagreement' when there are two reasonable views of the evidence." *Id.* (citing *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018)).

"Motions for new trial on grounds of newly discovered evidence are not favored by the courts and are viewed with great caution." *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987); *see Margraves v. State*, 56 S.W.3d 673, 685 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

New evidence will not warrant a new trial if, among other things, it is "merely cumulative, corroborative, collateral, or impeaching." *Carsner v. State*, 444 S.W.3d 1, 2 (Tex. Crim. App. 2014) (quoting *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003)). For example, in *Olmos v. State*, the defendant moved for a new trial, claiming he discovered evidence of an argument and fight between the victim's sons. *Olmos v. State*, 693 S.W.3d 474,

478 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd). The court found that the fight happened three years after the assault for which Olmos was convicted and "would not have undermined" the testimony of the victim's son who witnessed the attack. *Id.* at 482.

A defendant seeking a new trial must meet certain requirements. "A failure by defendant to establish any of the essential requirements warrants the trial court's denial of a new trial." *Shafer v. State*, 82 S.W.3d 553, 556 (Tex. App.—San Antonio 2002, pet. ref'd) (citing *Markham v. State*, 644 S.W.2d 53, 56 (Tex. App.—San Antonio 1982, no pet.)). Article 40.001 of the Texas Code of Criminal Procedure provides, "A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001. The court stated in *State v. Arizmendi*,

> To obtain relief under this provision, the defendant must satisfy the following four-prong test:
>
> (1)     the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;
>
> (2)     the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;
>
> (3)     the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and
>
> (4)     the new evidence is probably true and will probably bring about a different result in a new trial.

*State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017) (quoting *Carsner v. State*, 444 S.W.3d at 2–3).

17

Finally, we note that more than 120 years ago, the Texas Court of Criminal Appeals held that "a new trial will not be granted for the purpose of procuring impeaching testimony." *Navarro v. State*, 45 S.W. 724, 725 (Tex. Crim. App. 1898).

### B. Was the Information Unknown or Unavailable?

At the hearing on the motion for new trial, Barragon described a conversation that she had with Read's trial attorney, Dunnavant. Dunnavant asked Barragon to reach out to the APD for any documentation about when Gilbert first ran Read's license plate number. Barragon told Dunnavant that she did not have such information in her possession and, if there were such records, they would be in the possession of DPS. Dunnavant told Barragon that, in the past, Dunnavant had "subpoenaed these types of records from DPS and so she knew that they kept 'meta data' when officers ran something on their computer." Dunnavant also said she was not going to subpoena those records herself because she did not want to ask for a continuance, and she "thought it would be faster if [Barragon] . . . issued the subpoena for her." As described above, when questioning Gilbert before the jury, Dunnavant said to Gilbert, "in these cases, I often get evidence and I often see the TLETS data."

"A new trial is never allowed for the purpose of obtaining evidence that was known and accessible to the defendant at the time the cause was tried, 'and this is true although the defendant had knowledge of the evidence but failed to communicate it to his attorney.'" *Drew*, 743 S.W.2d at 227 n.14 (citing TEX. JUR. 3d, Vol. 25, Crim. Law, § 3488, pp. 359–60). "[A] defendant is not entitled to a new trial to procure evidence that was known and accessible to him at the time of trial, even if defense counsel did not learn about the evidence until later."

18

*Hamilton v. State*, 563 S.W.3d 442, 448 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd); *see*

*Marines v. State*, 292 S.W.3d 103, 111–12 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd)

(The appellant, who was convicted of murder, knew before trial that another person had fired a

gun at the scene. The appellant's ignorance of the caliber of the murder weapon was "of no

consequence" and "not newly-discovered for the purposes of a motion for new trial." Also,

"failure to obtain this evidence was due to a lack of diligence."); *Burns v. State*, 844 S.W.2d 934,

936 (Tex. App.—Amarillo 1992, no pet.) (appellant knew, before trial, the four affiants he relied

upon in his motion for new trial as "newly discovered evidence").

Based on these statements, Dunnavant was aware of the likely existence of the records

she sought and knew how to obtain them. She did not, though, exercise diligence in obtaining

them.

**C.** **The Documents Were Collateral and Only Useful for Impeachment**

The documents sought were likely admissible. However, their only use would be to

impeach Gilbert's recollection of how much time elapsed between the two times he checked the

status of Read's vehicle registration. In that regard, the information was collateral to the ultimate

question, whether Read committed the offense of DWI, third or more.

### D. Unlikely to Bring About a Different Result in a New Trial

Finally, if the evidence had been available to Read before trial, it would not have been likely to bring about a different result at trial. There was substantial evidence of Read's intoxication, and the initial traffic stop was justified based on Gilbert's perception of an insufficiently illuminated license plate light.

As a result, we find that the trial court did not abuse its discretion in denying the motion for a new trial.

## IV. Conclusion

Although there was a violation of the discovery requirements in Article 39.14, we find that the error was harmless. Therefore, a new trial was not required, and the trial court did not abuse its discretion in denying Read's motion.

Even so, we note an inaccuracy in the trial court's judgment.[14] The judgment states a finding of "True" on the first enhancement allegation, but "N/A" on the second enhancement allegation. However, the trial court found both enhancement allegations true. We modify the judgment to reflect a finding of "True" for both enhancement allegations.

---

[14]This Court has the "authority to reform a judgment . . . to make the record speak the truth when the matter has been called to [our] attention by any source." *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992). The Texas Rules of Appellate Procedure also provide direct authority for this Court to "modify the trial court's judgment." TEX. R. APP. P. 43.2.

As modified, we affirm the trial court's judgment.


Scott E. Stevens
Chief Justice

Date Submitted:    February 12, 2025
Date Decided:     June 18, 2025

Do Not Publish